DAVID NIEMAN, Plaintiff, *v.* VIOLA M. NADELMAN and Others, Defendants.*

Supreme Court, New York County, February 20, 1930.

* Affd., 229 App. Div. 865.

*Chase Mellen*, for the plaintiff.

*Marshall & Auchincloss*, for the defendant Nadelman.

*Arthur M. Loeb*, for the defendant Lippman.

*Hugo S. Mack*, for the defendant Kaplan.

*Sol Silver*, for the defendant J. Bornstein & Sons, Inc.

*Frederick W. Hamberg*, for the defendant National Surety Company.

LYDON, J. Most of the facts in this case are stipulated. Plaintiff seeks in the first cause of action to foreclose a mechanic's lien and in the second cause of action to recover damages as for breach of contract growing out of the same subject-matter and transaction.

The defendant Nadelman is the owner of the fee of premises No. 7 West Forty-fourth street. Said defendant entered into a twenty-one-year lease of said premises with a corporation known as 7 West Forty-fourth Street Corporation. This lease contemplated making of improvements to the building by the tenant to cost not less than $50,000. Before entering upon the making of said improvements the tenant was required to deposit with the landlord a surety bond in the sum of $70,000, containing a guaranty that said improvements to the extent of $50,000 should be fully completed not later than December 31, 1927, in accordance with plans and specifications to be approved by the owner. The owner, by means of raising a second mortgage on the premises, agreed to advance to the tenant in installments the sum of $50,000 as a building loan, and the tenant covenanted to make certain annual payments in amortization of said building loan of $50,000. The tenant under this lease was to furnish a builder. Paragraph 14 of said lease reads as follows: " It is understood and agreed that all moneys provided for to be advanced to the tenant pursuant to said building and permanent loan herein provided for shall be paid to the tenant on the tenant's requisition in the form of a written certificate, but only after the same has been approved by the architect and/or builders employed by the landlord as hereinafter provided for, provided the tenant at the time or times of making such requisition or requisitions shall have performed fully all covenants and conditions on its part to be performed in accordance with the terms of this lease and/or any other agreement incident to or pertaining to said mortgage loan. The payments to the tenant provided for in this paragraph shall be made in not more than seven (7) installments as the work of making improvements herein provided for progresses. No one of such installment payments shall be in an amount less than the sum of five thousand dollars ($5,000) or greater than the sum of ten thousand dollars ($10,000)."

The lease further provided that no payment would be made to the tenant while there should remain undischarged of record any mechanic's lien. The landlord was authorized to employ an architect for the purpose of passing on and approving all matters in reference to the improvements. In paragraph 26 of the lease it was provided that, if any default should be made by the tenant in payment of rent, taxes, etc., stipulated by the lease to be paid, or if the tenant should fail to keep or perform any other covenant, condition or agreement of the lease on its part to be performed, the landlord, if such default shall continue for a period of ten days after such notice, may give to the tenant ten days' notice of intention to end the terms of the lease. Pursuant to the lease, the tenant employed the defendant J. Bornstein & Son, Inc., as contractor, and a written

agreement was entered into. The tenant for his protection compelled the contractor to provide in the building contract that he would provide a bond of $70,000; in other words, he duplicated the terms in the lease which compel the tenant to give the owner a bond for $70,000 for completion. The evidence shows that both the tenant and the contractor endeavored to get a surety company to issue one bond instead of two, and finally they succeeded, and only one bond was given, but both the tenant and the contractor joined in it with the surety company as principals, and the bond ran to the owner of the premises providing for the completion of the contract. It is quite apparent from the evidence that both the contractor and the tenant were very weak financially, and that the owner recognized that situation.

The lease herein was dated August 15, 1927, and the tenant at that time was represented by a man named Stanley Kempner, its president, and the lease provided for the completion of the improvements not later than December 31, 1927. Nothing was done until about April, 1928, at which time a man named Alexander C. Xynos had taken over the defendant corporation and became president thereof. Apparently, at his request, on April 12, 1928, a modification of the lease was entered into between the defendant Nadelman, as landlord, and the tenant corporation. The effect of the modification was merely to extend the time within which the completion of the improvements could be made to September 1, 1928, and the time for the amortization of the bond and mortgage was likewise extended.

On the same date as the execution of the modification of the lease, April 12, 1928, a letter was executed by the tenant, 7 West Forty-fourth Street Corporation, and also signed by Stanley Kempner individually. This letter was addressed to the attorneys of the landlord, authorized representatives. Plaintiff claims that this letter was a modification of the terms of the lease, whereas defendant claims it was nothing more than an estoppel certificate executed by the then president of the tenant corporation, who had become the principal stockholder, and also the former principal stockholder individually in order to cut off any future claim for commissions or otherwise. The letter contains four material paragraphs. The 1st provided that the amount of cash security deposited should remain on deposit; the 2d paragraph provided that there would be no brokerage charges in connection with the execution or modification of the lease; and the 3d paragraph provided that with respect to the payments to be made by the landlord to the tenant under paragraph 14 of the lease the landlord was authorized, " subject to all the provisions of the lease and particularly the provision of said paragraph 14, to make such payment or payments direct to the building

contractor making the changes, alterations and improvements provided for in said lease instead of to the tenant; " the 4th paragraph had to do with the proper apportionment of charges between the former stockholder and the present. The testimony of the defendant Bornstein and his son is to the effect that they were never shown this letter, and were never consulted about it, but Mr. Bornstein, Jr., stated that, when he attended at the office for the final closing of the contract and the signing of the bond, etc., on April thirteenth, he was told by Mr. Xynos, the president of the tenant corporation, in the presence of Mr. Sager, as follows: " Bornstein, you are going to get the money direct from Marshall & Auchincloss. They are holding the money and you are getting it direct. It is not coming to me. It is going to you directly."

As to this letter the defendant claims through its witness Sager that this letter of April twelfth came to be written under the following circumstances: " It was considered necessary, or desirable at any rate to modify some of the terms of the lease that had been entered into between the 7 West 44th Street Corporation and the owner, and the letter was drawn up as a reflection of what all the parties had agreed to as being the modified terms of that lease." In referring to paragraph 3 of said letter Mr. Sager testified: " Paragraph 3 represents a modification that came about, as I recall it, at the suggestion of the contractor, Mr. Bornstein, who rather wanted to have payments made to him direct as a matter of convenience. As I recall it everybody was pretty hard pressed for funds, and simply as a matter of convenience the contractor was of the opinion that if the money would be directly payable to him instead of being paid over to the tenant and having the tenant draw his check or indorse his check over and have it go through those channels that provision should be put in there, that is, that the money could be paid if he saw fit, if the 7 West Forty-fourth Street Corporation saw fit, the money could be paid direct to the contractor instead of having it pass through the hands of the tenants." All the other witnesses say that Bornstein was not present at the drawing of that letter, but they do claim that he was advised of it in the presence of Mr. Sager, and they also claim that the letter was given at the suggestion of Mr. Sager, representing the owner.

The plaintiff claims that it was because of the financial weakness of the tenant that the owner desired to make the payments direct to the contractor. Very certainly the strongest inference in the testimony of Mr. Sager is to the effect that there was a desire to make provision for a direct payment to this contractor instead of making it first to the tenant. The contractor claims that, relying upon the statement made by Mr. Xynos in the presence of Mr. Sager after

that letter was delivered, and realizing that the payments were to come to the contractor direct, he willingly signed up the bond, and was anxious to go along with the contract. Immediately thereafter the contractor proceeded to do certain wrecking work on the premises, and gave out contracts to different concerns for essential material to be used in the alteration of the building, and continued that work from April thirteenth to May twenty-eighth, when he prepared a requisition for a payment on account. His requisition showed that about $6,800 of work was completed up to that time. Said requisition was delivered to Mr. Lippman, architect for the tenant. He, after approving of a payment of $5,000 thereon, turned said requisition over to the architect representing the owner, and he approved of the payment. He received the requisition back with the double approval, and on June fourth the defendant Bornstein took the certificate to Mr. Xynos, president of the tenant corporation, who told him to hurry down to the office of Marshall & Auchincloss to get the payment. He went to said office and presented the requisition to Mr. Sager, and, after Mr. Sager examined it, he stated: " We are not going to pay you any money. We are not going to pay you any money at all because the tenant has not paid his rent for June, and, furthermore, I do not recognize you. I do not know you."

Mr. Sager, in his testimony, states that he gave two reasons for refusing to honor the requisition, *first*, because the tenant was in default, and, *second*, because it was the requisition of Mr. Bornstein and not the requisition of the tenant. A few days after that Bornstein formally notified the owner that he could not proceed with the contract, unless the owner paid the amount due and earned under his contract, and that was refused. Thereupon defendant Bornstein filed a lien for the total amount of the work actually done on the building, as well as for all those items of work which were ordered and manufactured or in the course of manufacture for placement in the building. Said lien was bonded by the owner. Thereafter, and on June twenty-third, the defendant landlord began summary proceedings against the tenant 7 West Forty-fourth Street Corporation for failure to pay the rent and taxes, and thereafter a warrant of dispossess was issued on July 18, 1928. Under the lease, as above stated, the tenant was obliged to provide a completion bond of $70,000 as security to the owner that the alteration would be performed. Under the building contract between the defendant Bornstein and the tenant it was provided that the builder should give the tenant a $70,000 bond as security for the completion of the building. It appears that both the tenant and the builder, with the desire of saving, if possible, the payment of two premiums, agreed to enter

into one bond and both sign it, giving same to the owner. They finally found a surety company that would agree to that.

The plaintiff takes the position that, because this builder joined in this bond of completion as a principal, he could not recover any partial payment for the construction of the building and was not entitled to anything whatsoever until he had completed the building 100 per cent. Counsel for the plaintiff also points out in the brief that in the building contract it was specifically provided that the builder was to give to the " owner " a completion bond of $70,000, but, on reading the building contract, it will be observed that it is a printed form which is usually adopted by an owner of premises and the builder. The word " owner " is printed in numerous places, and, when the person who drafted the contract dictated the clause in reference to the $70,000 completion bond, he used the word " owner," which had reference to the tenant 7 West Forty-fourth Street Corporation only. That is not only obvious from reading the building contract, but it also conforms with the testimony in this case. Bornstein's explanation of why he entered into the bond was that he thought that the $50,000 was to be paid to him direct as a contractor as installments became due, and that he was confident he could perform his contract, and he did not hesitate to sign a bond in that form instead of giving the tenant a separate bond.

First, as to the bond, certainly the bond, so far as the contractor was concerned, was not one required by the lease. It is, however, a bond required to be given by the tenant to the owner, and, so far as the bond was concerned, the contractor was a volunteer. In any event, in reference to the lien, the evidence shows beyond any doubt that the landlord knew and provided for this improvement, and sanctioned the engagement of this contractor to proceed on behalf of the tenant. Furthermore, the letter of April twelfth is pronounced by the owner's own witness, Sager, on two or three occasions in the evidence as a modification of the lease. The witness Xynos states that the letter was already prepared when he went to the office of the owner's attorneys, and he was told that, if he did not sign that letter providing for the payment to the contractor of the installments as they became due, and not to him as tenant, the whole deal would be off.

Then we have the testimony of Bornstein to the effect that this man Xynos told him in the presence of Mr. Sager, just after the letter was signed, that all payments on the job would be made direct to the contractor. When the requisition was prepared and submitted it was not only approved by the tenant's architect, but by the representative of the owner, Mr. Sutcliffe, her architect, and then presented for payment. At the time that this requisition was made,

May twenty-eighth, there was no rent due; but by the time the requisition came back to the contractor, completely approved, it was June fourth, and the rent due from the tenant was payable June first, and the taxes which became due May first had not been paid.

The question arises as to whether this default on the part of the tenant could in any way deprive the contractor of his right to recover the amount of his lien under the first cause of action. I think it is a well-known rule of law that in all contracts the direct provisions of a statute are incorporated, and, as this contractor performed this work with the knowledge of this owner and in the belief that all payments of installments would be made direct to said contractor — and I think the evidence supports that fact — I am convinced of the fact that the plaintiff has an absolutely good cause of action as to his lien, notwithstanding the fact that he signed the bond of completion by joining with the tenant as a principal. The owner was fully aware of the fact that there was no obligation whatever on the contractor to become a party to that bond, and to seek to use that bond as a means of escaping the payment of such amount as is properly included in this mechanic's lien I think is both unjust and improper. I am glad to say that from statement of counsel that is really not the attitude of this owner, because the owner has set aside a certain amount of money with which to pay this lien, because she got credit for the value of all the work done on the building by this contractor when she made a new contract of lease and a new contract for improvement.

Now to come to the question as to what items are properly included in the lien. The following I deem proper items which are the subject-matter of the lien: (1) Work performed and materials furnished and incorporated in the building to June 4, 1928, $7,750; (2) materials furnished and delivered to the premises but not yet incorporated, $1,400; (3) loss of profits claimed by the manufacturer of the steel sash which was actually manufactured and tendered at the job, but was warehoused because there was no one there to receive it, $980. The total of these amounts is $10,130, with interest. The other items I do not consider proper items of mechanic's lien, and the plaintiff is, therefore, entitled to a judgment of foreclosure of his mechanic's lien in the sum of $10,130, or, in the alternative, to have a judgment in that amount, with interest.

As to the second cause of action, I think there is authority for maintaining this as a second cause of action, together with an action to foreclose a mechanic's lien, because, equity having acquired jurisdiction to establish and enforce the lien as to part of the contract, it can retain control of the entire controversy. The defendant claims that this plaintiff cannot recover because of the 6th clause

in the contract between the contractor and the tenant, the wording of which is as follows: " The owner shall not in any manner be answerable or accountable for any loss or damage that shall cr may happen to the said works or any part or parts thereof respectively," etc. But the same comment is to be made as to the use of the word " owner " above referred to in reference to the bond clause in the said contract. The word " owner " obviously had reference to the tenant who was making the contract and not to the owner of the fee. Besides that, this word " owner " is in a printed clause, and had no real reference to the defendant Nadelman. However, while the statute protected the plaintiff in enabling him to file the lien, nevertheless I cannot find any such contractual relationship between the defendant Nadelman and the contractor J. Bornstein & Son, Inc., which would justify a recovery by the plaintiff because of the stoppage of the work by the owner of the fee. Her lease with the defendant 7 West Forty-fourth Street Corporation provided for payment of rent and payment of taxes, and also provided that she was not to be called upon to make any payment out of the building loan as long as there was a default under the contract. Clearly, there was a default in that the rent had not been paid and the taxes were not paid on June fourth, and, while the contractor could protect himself as to the extent to which he had proceeded with the alteration of the building, I think he was barred from holding the defendant Nadelman responsible beyond the amount of his lien, because she had a right to refuse to pay anything beyond the amount of the lien, and, if the contractor elected to stop further work under his contract with the tenant, he cannot look to the defendant owner to reimburse him for his numerous losses, including prospective profit, because he knew, or should have known, of the terms of the contract and the lease. As to the second cause of action, therefore, I must dismiss the same. Likewise the counterclaim is dismissed. All objections made throughout the trial are overruled, with an exception in each case. All motions are disposed of in accordance with the conclusion reached herein, with an exception. Submit findings on notice.